**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **LIHUA ZHANG,** | § | |
| | § | |
| *Plaintiff,* | § | |
| **V.** | § | |
| | § | |
| **MARGARET MONROE; SCOTT** | § | **CIVIL ACTION NO. 6:13-CV-811** |
| **MONROE; CENTRAL MINING** | § | |
| **AMERICA, INC., a/k/a CENTRAL** | § | |
| **MINING AMERICA GROUP, CORP.;** | § | |
| **AND U.S. SALT INTERNATIONAL,** | § | |
| **INC., a/k/a FTC U.S. SALT** | § | |
| **MANAGEMENT LTD.,** | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Lihua Zhang's Motion for Summary Judgment (Doc. No. 114). Defendants Margaret Monroe and Scott Monroe ("the Monroes"), Central Mining America, Inc. ("CMA"), Central Mining America Group, Corp. ("CMA Group"), and U.S. Salt International, Inc. ("US Salt") (collectively, "Defendants") filed a Motion to Strike/Response (Doc. No. 116). Having considered the parties' arguments and the applicable law, the Court **GRANTS-in-part** and **DENIES-in-part** Plaintiff's Motion. To the extent Defendants assert any counterclaims in their Motion to Strike/Response, the Court **DENIES** Defendants' claims.

## I. BACKGROUND

This is a diversity action arising out of an ongoing business relationship between Plaintiff and Defendants. CMA was created in 2004 to offer salt mining production and operations services in connection with the Monroe Salt Mine located in the Grand Saline Salt Dome in East Texas. (P's MSJ, Doc. No. 114 at 8). On September 28, 2007, Mr. Monroe, acting as President of CMA, entered into an agreement to lease the Monroe Salt Mine from his wife, Mrs. Monroe, "for

the purpose of continuing the Developing, Constructing, Mining, Drilling, Producing, Operating, Transporting, Selling, and Exporting, of that salt minerals that are mined and Produced from underground." (Land and Salt Mineral Lease Agreement, Ex. 9, Doc. No. 114).

Ms. Zhang was first introduced to the Monroes and CMA through her husband who is involved with the mining services industry in China. (Unsworn Dec. of Lihua Zhang, Ex. 13 at ¶ 2-3, Doc. No. 114). According to Ms. Zhang, the Monroes represented to her that they had salt mine interests in East Texas that would prove profitable to potential investors. (*Id*. ¶ 4). In May of 2011, Ms. Zhang met with Mrs. Monroe in Beijing, China, to discuss the possibility of investing directly into CMA. (*Id*. ¶ 5). In December of 2011, Ms. Zhang traveled to the United States, and stayed with the Monroes at their home in Canton, Texas. (*Id*. ¶ 6). During her stay, the Monroes allegedly represented to her that she would be able to invest directly into CMA and maintain a 5% stake in the company by entering into a Subscription Agreement. (*Id*. ¶ 6; *see* Subscription Agreement, Ex. 14, Doc. No. 114). Ms. Zhang was further told that CMA was on course to receive a $45 million capital injection from Mr. Andrew Garner, an English investor, within the first six months of 2012 to jumpstart operations. (*Id*. ¶ 6).

Ms. Zhang entered into the Subscription Agreement on December 20, 2011, which in relevant part states:

> I, Li Hua Zhang [omitted] hereby subscribe for and purchase (5%) five percent of the common stock from Margaret Monroe of Central Mining America, Inc. a Texas corporation. The purchase price is USD 580,000 (five hundred eighty thousand US dollars) in cash plus other consideration and works.

(Ex. 14, Doc. No. 114). On December 28, 2011, Ms. Zhang wired approximately $80,000 to Mrs. Monroe's individual account. According to Ms. Zhang, the Defendants required $80,000 to pay off a debt to Dynatec, a mining services company, and that until such a debt was paid, CMA would be unable to secure the funding from Mr. Garner. (Ex. 13 at ¶ 6, Doc. No. 114).

On February 12, 2012, CMA's charter was forfeited for its failure to file a franchise tax return and/or pay a state franchise tax. (Ex. 7, Doc. No. 114).

In March of 2012, Ms. Zhang returned to the United States to apply for a green card under the EB-5 Immigrant Investor Program[1], under the alleged representation from the Monroes that her investment in a U.S.-based enterprise would qualify her for such a program. (*Id.* ¶ 6, 9). On March 16, 2012, Ms. Zhang wrote a check directly payable to Mrs. Monroe for $420,000 in fulfillment of the Subscription Agreement. (*Id.* ¶ 11). That same day, Mrs. Monroe acting as the CEO of CMA signed an agreement which stated:

> "Li Hua Zhang [omitted] has made a payment of US$500,000.00 (five hundred thousand US Dollars) according to the subscription agreement signed on Dec 20, 2011."

(Ex. 18, Doc. No. 114).

Ms. Zhang states that by October of 2012, it had become clear to her that there were numerous issues with the original Subscription Agreement and her investment in CMA. (Ex. 13 at ¶ 13, Doc. No. 114). Later that month, Ms. Zhang states she met with the Monroes in Beijing, who "expressed confidence that CMA would be up and running in the near future and would be able to pay me." (*Id.* ¶ 13). Ms. Zhang states that because of the Monroes' assurances she agreed to enter into a Convertible Notes Agreement (Ex. 18, Doc. No. 114) which converted her initial investment into a $500,000 loan to CMA, and which the company would be required to pay over a period of three years at a 30% interest rate. (*Id.* ¶ 13). Mrs. Monroe is the signatory to this agreement on behalf of CMA. (*Id.*).

---

[1] The EB-5 Immigrant Investor Program is administered by the United States Citizenship and Immigration Services and allows foreign investors to apply for a green card if they make an investment of a statutory amount in a commercial enterprise in the United States, and the investment plans to create or preserve 10 permanent full-time jobs for qualified U.S. workers; *See EB-5 Immigrant Investor Program*, https://www.uscis.gov/eb-5.

On March 20, 2013, Ms. Zhang sent Mrs. Monroe a letter demanding a payment of $650,000 ($500,000 principal and $150,000 interest) by March 30, 2013. (Ex. 19, Doc. No. 114). In response, CMA sent a letter to Ms. Zhang on April 9, 2013, notifying Ms. Zhang that neither CMA nor its representative issued or signed the Convertible Notes Agreement. (Ex. 20, Doc. No. 114).

On October 24, 2013, Ms. Zhang filed the instant case claiming a breach of contract, common law fraud (fraudulent misrepresentation), negligent misrepresentation, and violations of § 27.01 of the Texas Business & Commerce Code against the Defendants stemming from the Subscription Agreement and the Convertible Notes Agreement. Ms. Zhang further seeks to hold the Monroes individually liable for the acts of CMA through piercing the corporate veil and through § 171.255 of the Texas Tax Code.

## II. APPLICABLE LAW

### A. Summary Judgment Under Rule 56

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The movant bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine dispute of material fact. *Celotex*, 477 U.S at 322.

A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005). A dispute is "material" if its resolution could affect the outcome of the action. *Anderson*, 477 U.S. at 248.

Once a proper motion has been made, the nonmoving parties may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. 322 n.3 (quoting Fed. R. Civ. P. 56(e)). All the evidence must be construed in the light most favorable to the nonmoving party, and the court will not weigh the evidence or evaluate its credibility. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Furthermore, "only reasonable inferences in favor of the nonmoving party can be drawn from the evidence." *Mills v. Warner-Lambert Co.*, 581 F.Supp.2d 772, 779 (E.D. Tex. 2008) (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 n. 14 (1992). "If the [nonmoving party's] theory is… senseless, no reasonably jury could find in its favor, and summary judgment should be granted. *Eastman*, 504 U.S. at 468-69. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir.2003).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to their case on which they bear the burden of proof at trial. *Nebraska v. Wyoming,* 507 U.S. 584, 590 (1993); *Celotex Corp.,* 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322–23.

Defendants are proceeding *pro se* in this action. "A document filed *pro se* is 'to be liberally construed' and a *pro se* complaint, however inartfully pleaded, must be held to less

stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (per curiam) (citing *Estelle v. Gable,* 249 U.S. 97 (1976)). However, "*pro se* status does not exempt [a litigant] from the usual evidentiary requirements of summary judgment." *See Ellis v. Principi,* 246 F. App'x 867, 869 (5th Cir. Sept. 5, 2007) (per curiam) (citing *Grant v. Cuellar,* 59 F.3d 523, 524 (5th Cir. 1995)).

## III. DISCUSSION

### A. Breach of Contract

The first claim Ms. Zhang has brought against Defendants is a breach of contract claim for the October 30, 2012 Convertible Notes Agreement. Notably, this is the only claim which Defendants address or dispute in their response to Plaintiff's Motion.

Under Texas law, the essential elements of a breach of contract action are (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages sustained by the plaintiff as a result of the breach. *Academy of Skills & Knowledge, Inc. v. Charter Schools, USA, Inc.*, 260 S.W.3d 529, 536 (Tex. App. – Tyler 2008, pet. denied).

Ms. Zhang argues that she and CMA had a valid contractual agreement pursuant to the Convertible Notes Agreement which converted her stock purchase into a loan, and that Defendants breached the contract by failing to pay over the course of the three-year period. Ms. Zhang claims monetary damages in the amount of $500,00 plus interest on the loan.

In their response to Plaintiff's Motion, Defendants essentially assert two affirmative defenses to the enforcement of the Convertible Notes Agreement: fraud and unconscionability.

Defendants bear the burden of proof of establishing any affirmative defenses. *See* Tex. R. Civ. P. 94. If the party opposing a summary judgment relies on an affirmative defense, he must

come forward with summary judgment evidence sufficient to raise an issue of fact on each element of the defense to avoid summary judgment. *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex.1984). Unless these affirmative defenses are established as a matter of law, the burden will be upon Defendants to obtain jury findings to establish the necessary elements of these defenses. *Oilwell Division, U.S. Steel Corp. v. Fryer*, 493 S.W.2d 487 (Tex. 1973); *Texas Farmers Ins. v. Murphy*, 996 S.W.2d 873, 879-80 (Tex. 1999).

Defendants maintain that the Convertible Notes Agreement was fraudulently drafted and produced by Ms. Zhang. (Defs.' Resp. at ¶ 5, Doc. No. 116). Defendants claim they never discussed, reviewed, approved, consented to or agreed to, or had seen the agreement before it was produced. (*Id*. ¶ 2). Moreover, Defendants argue that the Convertible Notes Agreement was drafted in Chinese and translated into English by Ms. Zhang herself, further evidence of a fraudulent creation of the agreement. (*Id*. at ¶ 5).

Second, Defendants refer to the interest rate of 30% as "unlawful," which the Court interprets as an affirmative defense of substantive unconscionability. Substantive unconscionability refers to the fairness of the resulting agreement. *Lopez v. Garbage Man, Inc.*, No. 12-08-00384-CV, 2011 WL 125923 at *12 (Tex. App. – Tyler 2011, no pet.). Some courts in Texas have gone so far as to suggest that an agreement must be utterly lopsided, that is, there must be no reasonable or subjective parity between the values exchanged, for a contract to be substantively unconscionable. *El Paso Natural Gas Co. v. Minco Oil & Gas Co.*, 964 S.W.2d 54, 62 (Tex. App. – Amarillo 1997), *rev'd on other grounds*, 8 S.W.3d 309 (Tex. 1999) (citing *Wade v. Austin*, 524 S.W.2d 79, 85 (Tex. App. – Texarkana 1975, no writ)).

Here, Defendants fail to cite to summary judgment evidence in their response, and do not establish their affirmative defenses as a matter of law. Nor have Plaintiffs filed a reply brief

rebutting Defendants' affirmative defenses. As such, the Court finds that the issue remains unresolved as to whether the Convertible Notes Agreement is a valid contract, and if it is, whether a 30% interest rate is not unconscionable. Accordingly, the Court **DENIES** Plaintiff's Motion as to her breach of contract claim. The Court cautions the Defendants that to prevail on their affirmative defenses at trial, Defendants will bear the burden of proof of obtaining jury findings that establish the necessary elements of fraud, *see infra* Part III.B., and of unconscionability.[2]

### B.  Common Law Fraud

The Court next considers Ms. Zhang's claims of common-law fraud, *i.e.*, fraudulent misrepresentation. In Texas, to recover for fraud, a plaintiff must establish (1) a material misrepresentation, (2) which was false, (3) and which was either known to be false when made or was asserted without knowledge of its truth, (4) which was intended to be acted upon, (5) which was relied upon, and (6) which caused injury.'" *Zorrilla v. Aypco Construction II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998)). In the instant case, the Court finds summary judgment proper with regard to the fraudulent misrepresentation claims against Defendants.

As to the first two elements, a representation is material if it is important to the plaintiff in making a decision – that is, if a reasonable person would attach importance to and be induced to act on the information in determining whether to make a transaction. *Italian Cowboy Partners v. Prudential Ins.*, 341 S.W.3d 323, 337 (Tex. 2011). A false representation consists of words or other conduct that suggest to the plaintiff that a fact is true when it is not. *See Custom Leasing, Inc. v. Texas Bank & Trust Co.*, 516 S.W.2d 138, 142 (Tex. 1974).

---

[2] Defendants at this point are precluded from raising any counterclaims of usury under the Texas Finance Code against Plaintiff, and may only argue the interest rate as unconscionable for the purposes of establishing an affirmative defense to the breach of contract claim.

Ms. Zhang asserts that Defendants made a number of material factual misrepresentations to her. First, Ms. Zhang claims that the nature of the December 20, 2011 Subscription Agreement to purchase 5% common stock from CMA was misrepresented to her. (Ex. 14, Doc. No. 114). A "subscription" is "an agreement between a subscriber and an *entity*, or a written offer made by a subscriber to an entity before or after the entity's formation, in which the subscriber agrees or offers to purchase a specific ownership interest in the entity." TEX. BUS. ORGS. CODE ANN. § 1.002(84) (emphasis added). While the terms and breadth of the agreement are sparse, Ms. Zhang argues that the Subscription Agreement was not what it was purported to be by the Monroes. Ms. Zhang states that she believed she was investing directly into CMA and acquiring stock issued by the corporation. (Ex. 13 ¶ 6, Doc. No. 114). It was not until October of 2012 that it became clear to Ms. Zhang that there were numerous issues with the original subscription agreement and her investment. (*Id*. ¶ 13). According to Ms. Zhang, the stock was not issued by the corporate entity as a subscription, as represented to her by the Monroes, rather it was a sale of individual stock by Mrs. Monroe to Ms. Zhang.

Ms. Zhang also argues that Mrs. Monroe falsely represented to her that this investment and Subscription Agreement would permit Plaintiff to apply for an immigrant visa under the EB-5 category since she would be placing funds directly into a U.S.-based enterprise and therefore obtaining a direct interest in a viable company. (*See* Ex.13 at ¶ 6, Doc. No. 114).

Finally, Ms. Zhang argues that Defendants misrepresented the status of CMA as an entity legally authorized to conduct business in Texas. The record shows that at the time of accepting the $420,000 payment in fulfillment of the Subscription Agreement, CMA had already forfeited its charter status and became inactive a month earlier. (Ex. 7, Doc. No. 114). CMA did not apply for reinstatement until April 29, 2014, over two years later, and after the filing of this suit. (*Id*.).

Ms. Zhang maintains that at the time, she "did not know that Monroe was merely accepting the funds on her own behalf" and that had she known CMA was not an active corporation she "would have refused to execute the check and pay the funds." (Ex.13 at ¶ 11, Doc. No. 114).

The Court finds that Ms. Zhang has put forth sufficient evidence that Defendants made a factual misrepresentation as to the true nature of the Subscription Agreement and the ability of CMA to accept payment pursuant to the agreement. However, the summary judgment record is insufficient to show that Defendants misrepresented Ms. Zhang's immigration prospects. The Court does not discount that Ms. Zhang invested in CMA to facilitate immigration, but that alone does not support the allegation that the Monroes fraudulently misrepresented this fact.

As to the third element, a defendant makes a misrepresentation "knowingly" when the defendant is aware of its falsity or understands it is false. *Landers v. Aurora Loan Servs.*, 434 S.W.3d 291, 293-94 (Tex.App. – Texarkana 2014, no pet.). The Texas Supreme Court has held that "[a] person is charged with constructive notice of the actual knowledge that could have been acquired by examining public records." *Mooney v. Harlin*, 622 S.W.83, 85 (Tex. 1981). Constructive notice creates an irrebuttable presumption of actual notice. *Id*. A representation is made "recklessly" when a defendant makes it without any knowledge of its truth and makes it as a positive assertion of fact. *Johnson & Higgins v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 527 (Tex. 1998). In other words, a defendant makes a representation recklessly when it knows it does not have sufficient information or basis to support the representation, or when the defendant realizes it does not know whether the representation is true. *Id*. at 527. Direct or circumstantial evidence may be used to prove the defendant made the statements with or without knowledge of its truth. *Id*. at 526.

In their response, Defendants do not deny or refute Ms. Zhang's allegations of misrepresenting the individual stock transfer as a Subscription Agreement. Furthermore, the evidence is uncontroverted that CMA had forfeited its charter to conduct business in the State of Texas at the time of accepting payment from Ms. Zhang in fulfillment of the Subscription Agreement.

As a corporate entity, CMA had constructive notice of actual knowledge that it was not authorized to transact business in Texas at the time of accepting payment from Ms. Zhang as a result of forfeiting its charter status. Likewise, as officers and registered agents of the corporation, the Monroes also held constructive notice of actual knowledge of CMA's status as a business entity, as this knowledge is readily acquirable through examination of public records. The Defendants therefore had actual knowledge of the falsity of the representations made to Ms. Zhang about the Subscription Agreement and the payment made in fulfillment of the agreement.

Ms. Zhang also satisfies the fourth element of her fraud claim that (1) the defendant intended for the plaintiff to act in reliance on the presentation or had reason to expect that the plaintiff would do so and (2) the plaintiff incurred pecuniary loss in the type of transaction in which the defendant intended or had reason to expect that the plaintiff's conduct would be influenced. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 218-19 (Tex. 2011).

Ms. Zhang has established that Defendants intended for her or had reason to expect that she would rely on their representations as to the nature of the Subscription Agreement and the charter status of CMA. The parties do not dispute that Ms. Zhang intended to invest in CMA for the purposes of immigrating to the United States under the EB-5 Immigrant Investor Program. (*See* Defs.' Resp. Doc. No. 116) ("Plaintiff, Zhang fully understood that the investment has no guaranty of any profit/return or the investment must be at high risk according to US Immigration

program for Foreigner's investment into U.S. companies."). Defendants had reason to expect Ms. Zhang would rely on their representations about her investment in CMA because it directly affected her immigration prospects. Ms. Zhang also incurred pecuniary loss in the type of transaction which Defendants intended Plaintiff's conducted would be influenced by, *i.e.*, Ms. Zhang invested $500,000 pursuant to the Subscription Agreement.

Fifth, the summary judgment shows that Ms. Zhang relied and acted upon the misrepresentations made to her. Ms. Zhang states that if she "had known that CMA was not an active corporation, [she] would have refused to execute the check and pay the funds." (Ex. 13, Doc. No. 114). Ms. Zhang further states that she believed she was obtaining a direct interest in a viable company when she signed the Subscription Agreement on December 20, 2011. (*Id.*) *See Schwartz v. Pinnacle Comms.*, 944 S.W.2d 427, 435 (Tex. App. – Houston [14th Dist.] 1997, no writ) (where plaintiff's testimony that he decided to make an investment based on representations the defendant made about the creditworthiness of the company showed plaintiff's actual reliance).

Defendants aver that Ms. Zhang had performed intensive due diligence before making the investment. However, a plaintiff does not normally have a duty to use due diligence to discover whether the representation is fraudulent, *Koral Indus v. Security-Conn. Life Ins.*, 802 S.W.2d 650, 651 (Tex. 1990), unless it knows of facts that would lead a reasonably prudent person to investigate, *Arroyo Shrimp Farm, Inc. v. Hung Shrimp Farm, Inc.*, 927 S.W.2d 146, 153-54 (Tex. App. – Corpus Christi 1996, no writ). Here, Ms. Zhang did not know of any facts that would have led a reasonably prudent person to believe that CMA was going to lose its charter status two months after entering into the Subscription Agreement, and that despite losing its status, would still conduct business and accept payment from Ms. Zhang.

Lastly, as a result of Ms. Zhang's reliance on Defendants' representations, Ms. Zhang has suffered damages of $500,000 from her investment in CMA. Defendants do not dispute that CMA and Mrs. Monroe signed a document memorializing that Ms. Zhang paid $500,000 pursuant to the Subscription Agreement. (*See* Defs.' Answer, Doc. No. 3 at ¶ 28; Defs.' Resp., Doc. No. 116).

Ms. Zhang has provided uncontroverted summary judgment evidence to support each element of her fraudulent misrepresentation claim. Defendants fraudulently misrepresented to her the true nature of the Subscription Agreement and the legal status of CMA to conduct business in Texas with the intention that Ms. Zhang would act upon such representations.

Though Defendants are *pro se*, as the non-moving party they still bear the burden to present affirmative evidence setting forth specific facts showing the existence of a genuine issue for trial once a plaintiff has made a proper motion. Defendants neither refute nor deny any of Ms. Zhang's claims of fraudulent misrepresentation, thereby failing to establish a genuine issue of material fact. As summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to their case on which they bear the burden of proof at trial, *Nebraska v. Wyoming,* 507 U.S. 584, 590 (1993), the Court **GRANTS** Plaintiff's Motion for Summary Judgment as to her claim of common-law fraud (fraudulent misrepresentation). *See also Celotex Corp.,* 477 U.S. at 322.

### C. Negligent Misrepresentations

Ms. Zhang's negligent misrepresentation claims arise out of the same set of facts and misrepresentations addressed above. Though these statements more properly align with a claim of fraudulent misrepresentation, out of an abundance of caution, the Court considers Ms. Zhang's claims under the lens of negligent misrepresentation, and finds that even if Ms. Zhang did not

prevail in establishing fraud, Defendants would at the least still be liable for negligent misrepresentation.

To establish a cause of action for negligent misrepresentation, a plaintiff must prove the following elements: (1) the representation was made in the course of defendant's business, (2) false information was supplied for the guidance of others in their business, (3) Defendants did not exercise reasonable care or competence in obtaining or communicating the information, and (4) Plaintiff suffered pecuniary loss by justifiably relying on the representation. *See Gen. Elec. Capital Corp. v. Posey,* 415 F.3d 391, 396–97 (5th Cir.2005); *First Nat'l Bank of Durant v. Trans Terra Corp. Int'l*, 142 F.3d 802, 809 (5th Cir.1999) (citing *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex.1991)).

As to the first element, the summary judgment evidence clearly shows that the representations made by CMA and the Monroes to Ms. Zhang were made in the course of business, that is, to acquire Ms. Zhang's investment in CMA. Second, as the Court found above, the Defendants provided false information, namely the individual stock transfer presented as a subscription of stock and CMA's ability to conduct business in the State of Texas to Ms. Zhang, which she used to make her decision to invest in CMA. Third, Defendants failed to use reasonable care when they communicated this false information to Plaintiff. CMA and the Monroes, through constructive notice, had actual knowledge of CMA's inactive status as a business entity, and had constructive notice of the misleading nature of the Subscription Agreement. And fourth, Ms. Zhang suffered the loss of $500,000 in purchasing stock from Mrs. Monroe by justifiably relying on the Defendants' representations.

Defendants again do not address the negligent misrepresentation claim in their response to Ms. Zhang's Motion. As Ms. Zhang has put forth sufficient summary judgment evidence to

support each element of her negligent misrepresentation claim, and as Defendants have failed to show the existence of a genuine issue of material fact as to any of the elements, the Court **GRANTS** Plaintiff's Motion as to this claim as well.

### D.   Statutory Fraud in Stock Transactions

In addition to her common law claims, Ms. Zhang has brought forth a state statutory fraud claim against Defendants pursuant to Texas Business & Commerce Code § 27.01. This statute imposes civil liability for false representations of material facts that are relied on by a plaintiff in entering into a real estate or stock transaction. *U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 406 (5th Cir. 2000).

"Fraud under this section consists of either a 'false representation of a past or existing material fact, when the false representation is' made to another person with the intent to induce that person to enter into the contract and that person relies on that representation, or 'a false promise to do an act, when that false promise is material' and made without the intention of completing it. *Id.* (citing TEX. BUS. & COMM. CODE ANN. § 27.01(a)). Therefore, "[t]he elements of statutory fraud in the sale of stock are substantially the same [as common law fraud] except that to recover actual damages, a plaintiff does not have to prove that the defendant knew a statement was false." *O'Hare v. Graham*, 455 Fed. App'x. 377, 380 (5th Cir. 2011) (citing *Perenco Nigeria, Ltd. v. Ashland, Inc.*, 242 F.3d 299, 306 (5th Cir. 2011)) (interpreting TEX. BUS. & COMM. CODE ANN. § 27.01). Section 27.01(a) also applies only to situations where there is an actual conveyance of the stock, and not to situations where there is merely a breach of contract to convey stock. *U.S. Quest Ltd.*, 228 F.3d 406. "This narrow reading of Section 27.01(a) is consistent with the Supreme Court of Texas' interpretation that the statute is penal in nature and thus must be strictly construed." *Id.*

First, Ms. Zhang argues that CMA and the Monroes made false representations of existing facts specifically when they entered into what they described as a "subscription agreement" to induce her into the stock transaction, knowing that Ms. Zhang was not actually acquiring shares from the corporation itself. (Doc. No. 114 at 29). Mrs. Monroe, purportedly acting on behalf of CMA, accepted Ms. Zhang's payment in fulfillment of the subscription agreement. The statutory fraud claim analysis as to false representations of a past or existing material fact is subsumed within the fraudulent misrepresentation analysis, having already found that Ms. Zhang established every element of the latter.

Ms. Zhang additionally argues that Defendants made false promises to act that were material to Ms. Zhang's decision to enter into the agreement, specifically that Defendants would obtain $45 million in funding from Mr. Andrew Garner to buy mining equipment to make CMA operable. (Doc. No. 114 at 30). Though the parties do not dispute that the promise was never actualized, Ms. Zhang does not provide any summary judgment evidence that would support the allegation that Defendants did not intend to perform on the promise.

The Court finds that Ms. Zhang has proffered sufficient summary judgement evidence to establish statutory fraud as to the false representations regarding the true nature of the Subscription Agreement, and accordingly **GRANTS** Ms. Zhang's Motion as to this claim.

### E. Piercing the Corporate Veil

Ms. Zhang seeks to pierce CMA's corporate veil and impose vicarious liability upon the Monroes. The corporate veil usually protects parent companies, shareholders, officers, directors, and affiliates from personal liability for corporate obligations, whether arising from contract or tort. *See Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986); TEX. BUS. ORGS. CODE § 21.233(a). Under Texas law, "there are three broad categories in which a court may pierce the

corporate veil: (1) the corporation is the alter ego of its owners and/or shareholders; (2) the corporation is used for illegal purposes; and (3) the corporation is used as a sham to perpetuate fraud. *Rimade Ltd. v. Hubbard Enterprises, Inc.*, 388 F.3d 138, 143 (5th Cir. 2004).

Whether a case arises out of a tort or a contract dispute determines whether a plaintiff must establish actual fraud or constructive fraud to impose vicarious liability. Tort claimants and contract creditors must only show constructive fraud for purposes of piercing the corporate veil. *Spring Street Partners-IV, L.P. v. Lam*, 730 F.3d 427, 443 (5th Cir. 2013). Under the doctrine of constructive fraud, "[n]either fraud nor an intent to defraud need be shown as a prerequisite to disregarding the corporate entity; it is sufficient if recognizing the separate corporate existence would bring about an inequitable result." *Castleberry*, 721 S.W.2d at 272-73 (alteration in original) (citations omitted). "Examples [of an inequitable result] are when the corporate structure has been abused to perpetrate a fraud, evading an existing obligation, achieve or perpetrate a monopoly, circumvent a statute, protect a crime, or justify wrong." *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 451 (Tex. 2008).

Where a case arises out of a contractual dispute, the Texas Business Organizations Code sets forth additional requirements, and the veil may only be pierced where the defendant "caused the corporation to be used for the purpose of perpetrating and did perpetrate an *actual fraud* on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate." Tex. Bus. Orgs. Code § 21.233(b) (emphasis added). "[I]n the context of piercing the corporate veil, actual fraud is not equivalent to the tort of fraud. Instead in that context, actual fraud involves 'dishonesty of purpose or intent to deceive'." *Matter of Ritz*, 832 F.3d 560 (5th Cir. 2016) (quoting *Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex. App.—Dallas 2010, no pet.) (quoting *Castleberry*, 721 S.W.2d at 723). Courts may deduce fraudulent intent from all of the

facts and circumstances. *Spring Street Partners-IV, L.P. v. Lam*, 730 F.3d 427, 443 (5th Cir. 2013).

This Court need not determine whether the constructive or actual fraud standard applies because Ms. Zhang has already offered sufficient evidence to prove the higher burden of the two. Mrs. Monroe was the signatory to an agreement for an individual sale of stock which purported to be a subscription. Mrs. Monroe, while acting on behalf of CMA, personally accepted a payment of $420,000 from Ms. Zhang, even though CMA had lost its charter to conduct business a month earlier. Mrs. Monroe accepted a wire transfer of $80,000 directly into her individual account. Moreover, Ms. Zhang has presented evidence that she was led to believe Mr. Garner would invest $45 million into CMA to make the company operable. The record further indicates that the Monroes would share or interchange officer positions within CMA, including the positions of CEO, President, and Secretary. (*See* Ex. 3, 5, 7, 9, 18). Mrs. Monroe also leased her mineral interests located near Grand Saline, Texas to CMA, which Mr. Monroe signed as President on behalf of CMA, directly pitting Mrs. Monroe's interests as a lessor against her interests as an officer of CMA.

In looking at the totality of the Monroe's actions, it is clear that not only is CMA so inextricably linked to Mr. and Mrs. Monroe that a separation between the three has ceased to exist, but Ms. Zhang has met her burden in establishing that the Monroes used CMA to perpetuate actual fraud. The Monroes directly and personally benefitted from the approximate $80,000 wired to Mrs. Monroe and for the $420,000 check made out to Mrs. Monroe. The Court therefore finds that CMA's corporate veil should pierced on the basis that the Monroes perpetrated fraud through CMA, and that the Monroes should be subjected to individual liability for acts committed on behalf of CMA.

**F.  Individual Liability for CMA's Debts under § 171.255 of the Texas Tax Code**

Ms. Zhang also seeks to hold the Monroes individually liable for the Convertible Notes Agreement pursuant to § 171.255 of the Texas Tax Code. This section holds in relevant part that:

> If the corporate privileges of a corporation are forfeited for the failure to file a report or pay a tax or penalty, each director or officer of the corporation is liable for each debt of the corporation that is created or incurred in this state after the date on which the report, tax, or penalty is due and before the corporate privileges are revived.

TEX. TAX. CODE ANN. § 171.255(a). The Monroes both functioned as officers or directors of Central Mining America between 2005 and 2014. (*See* Exs. 3, 5, 7, 9, 18, Doc. No. 114). On February 10, 2012, CMA lost its corporate charter for "failure to file a franchise tax return and/or pay state franchise tax," and remained inactive until 2014. (Ex. 7, Doc. No. 114). Ms. Zhang alleges that Mrs. Monroe, acting as an officer of CMA, entered into the Convertible Notes Agreement as a debt obligation on October 30, 2012, more than eight months after CMA lost its charter status. (*See* Ex. 19, Doc. No. 114).

Ms. Zhang argues that the Monroes, as directors and officers of CMA, became individually liable for defaulting on the convertible note because they entered into the agreement while CMA's charter was inactive. (Doc. No. 114 at 33). Ms. Zhang avers that the Monroes are individually liable for the debt of $500,000 plus an interest of 30% compounded annually for a period of three years.

Not only have Defendants raised a genuine issue of material fact as to the validity of the Convertible Notes Agreement, *see supra* Part III.A., which would preclude the Court from ruling on this issue at this time, but the Court need not even reach a decision on this issue, as it has already found that the Monroes should be held individually liable for the acts committed by CMA on other grounds.

### G. Pro Se Corporate Defendants

Finally, Ms. Zhang argues that summary judgment should be granted against CMA as to all claims because CMA is unrepresented by counsel. Courts have uniformly held that a person who has not been admitted to the practice of law may not represent anybody other than himself in federal court. *Blount v. Maness*, 1:14-CV-297, 2015 WL 5719851(E.D. Tex. 2015). However, this Court has previously ruled in an Order and Advisory that it would be neither fair nor efficient to grant default judgment in Plaintiff's claims against CMA while at the same time piercing the corporate veil to hold the Monroes vicariously liable for any acts and judgment against CMA. Where Ms. Zhang has essentially asserted that the Monroes are one and the same as CMA, and the Court has agreed to hold the Monroes individually liable for the acts of CMA, it would not be improper to allow the Monroes to proceed in representing CMA.

### H. Defendants' Counterclaims

In their response to Ms. Zhang's Motion, Defendants seemingly assert two counterclaims. First, Defendants claims that the 5% share in CMA is valued at $780,000, not $500,000 and that Ms. Zhang owes Mrs. Monroe a balance of $280,000. (*See* Doc. No. 116). Second, Defendants claim that Ms. Zhang's alleged fraudulent conduct in forging the Convertible Notes Agreement has caused extensive damage to CMA and its associates, and seek damages in the estimate of $8 million. (*Id.*). The Court denies Defendants' claims as unsupported by any evidence and untimely, as these allegations are being raised for the first time in their response to Plaintiff's summary judgment motion. To the effect Defendants seek judgment on any other counterclaims or causes of action, the Court denies these as well.

## IV.    CONCLUSION

For the reasons stated herein, the Court **GRANTS-in-part** Plaintiff's Motion for Summary Judgment (Doc. No. 114) as to her claims of fraudulent misrepresentation, negligent misrepresentation, and statutory fraud pursuant to Texas Business & Commerce Code § 27.01. The Court further finds that it would be appropriate to pierce the corporate veil as to CMA, and to hold the Monroes individually and vicariously liable for any acts and judgments against CMA. However, the Court finds that Defendants have raised a genuine issue of material fact as to Plaintiff's breach of contract claim, and **DENIES-in-part** Plaintiff's Motion as to this claim. To the extent Defendants raise any counterclaims in their Motion to Strike/Response, the Court **DENIES** Defendants' Motion (Doc. No. 116).

**So ORDERED and SIGNED this 11th day of January, 2017.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE